U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed October 11, 2012**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| FIBERTOWER NETWORK SERVICES CORP., | § | |
| ET AL., | § | |
| DEBTORS. | § | |
| ——————————————————— | § | |
| | § | CHAPTER 11 |
| FIBERTOWER NETWORK SERVICES CORP., | § | |
| ET AL., | § | |
| DEBTORS. | § | CASE NO. 12-44027-DML-11 |
| | § | JOINTLY ADMINISTERED |
| V. | § | |
| | § | |
| FEDERAL COMMUNICATIONS COMMISSION, | § | ADVERSARY NO. 12-4104 |
| DEFENDANT. | § | |
| | § | |
| | § | |

## <u>MEMORANDUM OPINION</u>

Before the court is *Debtors' Emergency Motion (I) To Enforce Automatic Stay Against*

*the Federal Communications Commission or, In the Alternative, (II) For Injunctive Relief*

*Barring the Actual Cancellation of the Debtors' Spectrum Licenses Until Such Time As a Final,*

1

*Non-Appealable Order Has Been Entered In Respect of Cancellation of the Licenses* (the

"Motion") at docket no. 2,[1] filed in the above-captioned adversary proceeding[2] by Fibertower

Network Services Corporation *et al.*[3] (collectively, "Debtors"). By the Motion, Debtors ask that

the court either (1) determine that the automatic stay of section 362(a) of the Bankruptcy Code

(the "Code")[4] prevents certain actions by the Federal Communications Commission (the

"Commission" or "Defendant"), which will be described below, or (2) stay the Commission

pursuant to Code section 105 as described below.[5] The court held a hearing on the Motion on

September 12, 2012 (the "Hearing"). At the Hearing, the court heard testimony from Kurt Van

Wagenen ("Van Wagenen"), Debtors' President and Chief Executive Officer. The court also

admitted into evidence portions[6] of two declarations made by Van Wagenen prior to the Hearing:

the *Declaration of Kurt Van Wagenen in Support of Chapter 11 Petitions and First Day Motions*

(the "Petition Declaration") and the *Declaration of Kurt Van Wagenen in Support of Debtors'*

---

[1] All documents cited from the docket in this memorandum opinion may be located in the underlying adversary proceeding, cause no. 12-4104-dml, unless otherwise noted.

[2] *See* FED. R. BANKR. P. 7001(7). Although Debtors brought the instant case as an adversary proceeding, Debtors filed only a single motion requesting either to enforce the automatic stay or, alternatively, for injunctive relief. To the extent Debtors ask this court to enforce the automatic stay, the Motion also constitutes a contested matter pursuant to FED. R. BANKR. P. 9014.

[3] Debtors in these jointly administered chapter 11 cases are: (1) FiberTower Network Services Corp.; (2) FiberTower Corporation ("FTWR"); (3) FiberTower Licensing Corp.; and (4) FiberTower Spectrum Holdings, LLC.

[4] 11 U.S.C. §§ 101 *et seq.*

[5] Debtors filed their *Memorandum of Law in Support of Debtors' [Motion]* at docket no. 4 on August 23, 2012. In response, Defendant filed *[Defendant's] Objection to Debtors' Emergency Motion to Enforce Automatic Stay or for Injunctive Relief* (the "Objection") at docket no. 14 on September 4, 2012. Debtors filed *Debtors' Reply in Support of [the Motion]* (the "Reply") at docket no. 17 on September 7, 2012.

[6] The portions admitted are set forth at Transcript of Proceedings, September 12, 2012 at 31-37 at docket no. 38. Hereinafter, the transcript will be cited as TR (*name of witness, if applicable*) at __.

*Verified Complaint for Declaratory and Injunctive Relief* (the "Complaint Declaration").[7]

Following the Hearing, the court denied the Motion in part and granted the Motion in part from

the bench. The court issued its *Order Granting Preliminary Injunction* respecting the Motion on

September 27, 2012 (the "9/27 Order") at docket no. 40. In the 9/27 Order, the court stated it

would explain its decision in this memorandum opinion.

The court exercises core jurisdiction over this adversary proceeding pursuant to 28

U.S.C. §§ 1334 and 157(b)(2)(A). This memorandum opinion constitutes the court's findings of

fact and conclusions of law. FED. R. BANKR. P. 7052.[8]

# I. BACKGROUND

## A. Debtors' Capital Structure and Bankruptcy

Debtors are in the business of providing facilities-based backhaul services, principally to

wireless carriers, as well as millimeter-band spectrum services. Petition Declaration ¶ 5.

Backhaul is defined as the transport of voice, video, and data traffic from a wireless carrier's

mobile base station, or cell site, to its mobile switching center or other exchange point. *Id*.

Debtors provide spectrum leasing services directly to other carriers and enterprise clients, and

additionally offer their spectrum services through spectrum brokerage agreements and fixed

wireless equipment partners. *Id*. Debtors have customer service agreements with major U.S.

wireless carriers, including AT&T, Verizon Wireless, T-Mobile, Sprint, and MetroPCS. *Id*. ¶ 8.

---

[7]     The court also received into evidence letters to the Commission from Debtors, Debtors' customers, and a
trade organization.

Following the Hearing, Defendant also filed a conditionally unopposed motion to file a supplemental
statement to correct certain allegedly incorrect statements Van Wagenen made during his testimony
regarding whether, under applicable administrative law, a licensee can revive or shield automatically
terminated licenses by expanding its network infrastructure after the termination deadline. *See* docket no.
37. Debtors then filed a response. *See* docket no. 39. However, the court's opinion does not require the
court to resolve whether actions taken after a termination deadline affect a licensee's entitlement to its
licenses. *See infra* note 18.

[8]     *See also supra* note 2.

3

Debtors also hold national-scope service agreements with Verizon Business and CenturyLink, which allow Debtors to provide fixed wireless government-grade transport services.  *Id*.

Debtors' capital structure consists of secured debt, unsecured debt, and equity.  *Id*. ¶ 10. On November 9, 2006, FTWR issued $402.5 million of 9% Senior Secured Convertible Notes due 2012 (the "2012 Notes"), which were jointly and severally guaranteed by each of the other Debtors and by certain non-debtor affiliates.[9]  *Id*. ¶ 13.  The 2012 Notes were secured by a first priority pledge of substantially all the assets of Debtors and their non-debtor affiliates and the stock of all the guarantors.[10]  *Id*.  Debtors principally utilized the proceeds of the 2012 Notes to expand their network infrastructure.  *Id*.

Debtors underwent a restructuring on December 22, 2009 (the "2009 Restructuring") to reduce their total outstanding debt.  *Id*. ¶ 11.  Through the 2009 Restructuring, Debtors redeemed $266,791,438 in principal amount of the 2012 Notes, amounting to roughly 90.8% of the outstanding notes.  *Id*.  Each $1,000 in principal amount of the 2012 Notes was redeemed for $47.65 cash, 114.616 shares of common stock, and $425.46 in principal amount of 9.00% Senior Secured Notes due 2016 issued by FTWR (the "2016 Notes").  *Id*.  The 2016 Notes are jointly and severally guaranteed on a senior basis by each Debtor and by non-debtor affiliates.[11]  *Id*. ¶ 12.  The 2016 Notes rank *pari passu* in right of payment to the 2012 Notes, but, under the terms of the 2009 Restructuring, the 2016 Notes are secured by a first priority pledge of substantially all the assets of Debtors and their non-debtor affiliates and the stock of all the subsidiary

---

[9]     These guarantors were (1) FiberTower Broadband Corp.; (2) FiberTower Licensing Corp.; (3) Teligent Services Acquisition, Inc.; (4) FiberTower Network Services Corp.; (5) FiberTower Solutions Corp.; and (6) FiberTower Spectrum Holdings LLC.  Petition Declaration ¶ 12 n.6.

[10]    *See supra* note 9.

[11]    *See supra* note 9.

guarantors,[12] while the 2012 Notes are secured by a second priority pledge of the same assets. *Id*. ¶¶ 12, 14.

As of the 2009 Restructuring, holders of the 2012 Notes (the "2012 Noteholders") and holders of the 2016 Notes (the "2016 Noteholders"), along with their respective indenture trustees, entered into an Amended and Restated Intercreditor Agreement (the "Intercreditor Agreement"). *Id*. ¶ 15. Under the Intercreditor Agreement, the 2012 Notes are subject to and subordinate in priority to the 2016 Notes. *Id*. The 2012 Noteholders also consented to, and agreed not to contest or oppose, the use of cash collateral and any adequate protection (including superpriority replacement liens) provided to the 2016 Noteholders. *Id*. Based on Debtors' recent valuation of their business, the 2012 Notes are wholly unsecured.[13] *Id*. ¶ 14.

Beginning in 2011, Debtors experienced a series of adverse economic events that impacted Debtors' revenue and ability to raise capital. *See id*. ¶¶ 19-22. According to Debtors, their liabilities currently outweigh their assets. *See id*. ¶ 9. Pursuant to negotiations with an ad hoc committee of the 2016 Noteholders, Debtors formulated a proposed plan of reorganization (the "Proposed Plan"),[14] and filed a petition under chapter 11 of the Code, along with the Proposed Plan, on July 17, 2012. *Id*. ¶¶ 24-26; Complaint Declaration ¶ 1. On the same day,

---

[12]     *See supra* note 9.

[13]     In addition to the 2016 Notes and 2012 Notes, Debtors have approximately $30 million of unsecured liabilities, consisting of trade payables and other general unsecured pre-petition claims. Petition Declaration ¶ 16. Debtors are also parties to numerous executory contracts. *Id*.

FTWR is authorized to issue 400 million shares of common stock, par value of $0.001, of which approximately 48 million shares are outstanding. Approximately 16 million shares are owned by insiders. *Id*. ¶ 17. Although FTWR's common stock was once traded on NASDAQ, it was delisted effective January 30, 2012, and is now traded over the counter. *Id*.

FTWR also owns, directly or indirectly, 100% of the equity interests in each Debtor and non-debtor subsidiary. *Id*.; *see also supra* note 9.

[14]     The Proposed Plan may be found at Plan Support Agreement, *infra* note 15, Ex. B. A concise summary of the Proposed Plan may be found at Petition Declaration, Ex. A.

Debtors and the 2016 Noteholders entered into a plan support agreement (the "Plan Support Agreement"),[15] the relevant terms of which will be discussed as necessary below.

### B. The Spectrum Portfolio and the Commission's Regulatory Regime

At issue in the above-captioned adversary proceeding is Debtors' national spectrum portfolio (the "Spectrum Portfolio") of 24 GHz and 39 GHz wide-area spectrum licenses (collectively, the "Licenses"). Petition Declaration ¶¶ 6-7, 38. The Spectrum Portfolio extends over substantially all the continental United States, covering areas with a total population of over 300 million. *Id.* ¶ 6. Debtors lease portions of this spectrum to various customers. *Id.*

The Licenses are issued and regulated by the Commission pursuant to its authority to allocate the electromagnetic spectrum and regulate wireless communications used in interstate and foreign commerce under 47 U.S.C. §§ 151 *et seq.* (the "Communications Act"). In accordance with the Commission's regulations, "[e]ach licensee must make a showing of 'substantial service' within ten years of its license grant" as a condition precedent to license renewal (alternatively, "Substantial Service," "Substantial Service Showing," or "Substantial Service Standard," as appropriate). 47 C.F.R. § 101.527(a). The regulations define Substantial Service as "service which is sound, favorable, and substantially above a level of mediocre service which just might minimally warrant renewal during its past license term." *Id.* While the Commission has identified safe harbors by satisfaction of which licensees may ensure that they satisfy the Substantial Service Standard ("Safe Harbors"), compliance with the Safe Harbors is not a necessary condition to license renewal; the Commission evaluates licensees' compliance with the Substantial Service Standard on a case-by-case basis.[16]

---

[15]     The Plan Support Agreement may be found at Petition Declaration, Ex. B.

[16]     *See, e.g., Amendments to Part 1, 2, 87, and 101 of the Commission's Rules to License Fixed Services at 24 GHz*, Report and Order, 26 F.C.C.R. 11614 (2000) ("24 GHz Order"); *Amendment of Commission's Rules*

Wide-spectrum licenses "in general remain valid until terminated in accordance with" Commission regulations. 47 C.F.R. § 1.955(a). "Authorizations automatically terminate, without specific Commission action," if the license expiration date passes before the licenseholder files a timely application for renewal, or "if the licensee fails to meet applicable construction or coverage requirements." *Id*. § 1.955(a)(1). A licensee's failure to satisfy the Substantial Service Standard results in termination of the licenses. *Id*. § 1.955(b).

"Any person aggrieved by any action taken pursuant to" authority delegated by the Commission "may file an application requesting review of that action by" the full Commission. *Id*. § 1.115(a). "In the event the Commission orders further proceedings, it may stay the effect of the order from which review is sought." *Id*. § 1.115(h)(2); *see also id*. § 1.102. "The filing of an application for review shall be a condition precedent to judicial review of any action taken pursuant to delegated authority." *Id*. § 1.115(k). Following a final action by the full Commission, a licensee may file a petition requesting reconsideration of the final Commission action. *Id*. § 1.106. "[U]pon good cause shown, the Commission will stay the effectiveness of its order or requirement pending a decision on the petition for reconsideration." *Id*. § 1.106(n). Appeals may then be taken "from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia" (the "D.C. Circuit"). 47 U.S.C. § 402(b). Once a licensee files a notice of appeal to the D.C. Circuit, that court has the power "to grant such temporary relief" to stay the effect of the Commission's decision

> as it may deem just and proper. Orders granting temporary relief may be either affirmative or negative in their scope and application so as to permit either the maintenance of the status quo . . . or the restoration of a position or status terminated or adversely affected by the order appealed from.

---

*Regarding the 37.0-38.6 GHz and 38.6-40.0 GHz Bands*, Report and Order and Second Notice of Proposed Rulemaking, 2012 WL 3195374 (1998) (the "39 GHz Order"). These documents may be found in *Appendix in Support [of the Motion]*, Exs. A-B, at docket no. 18, which Debtors filed on September 7, 2012. *Accord* TR (Van Wagenen) at 40, 45.

*Id.* § 402(c).

The Commission initially granted the Licenses to Debtors around 1998.[17] In 2008, the Commission renewed the Licenses to dates ranging from 2017 to 2021, subject to Debtors making a Substantial Service Showing for each License. TR (Van Wagenen) at 39; Petition Declaration ¶ 31. In 2008, upon Debtors' request, the Commission granted Debtors a four-year extension, thereby pushing the deadline for the Substantial Service Showing to June 1, 2012. Petition Declaration ¶ 32; TR (Van Wagenen) at 78. In April 2012, Debtors petitioned the Commission for either a waiver of the Safe Harbor rules, or an additional three-year extension of the June 1, 2012 deadline. Petition Declaration ¶ 32.

The record indicates that the overwhelming majority of the Licenses do not presently satisfy the Safe Harbor requirements. TR (Van Wagenen) at 78-79, 82-84. Debtors maintain that they currently possess the resources to comply with the Safe Harbor requirements, *id.* at 54-55, but that doing so would necessitate the construction of "links to nowhere:" installation of costly, suboptimal equipment that (1) serves no immediate customer demand, (2) would require substantial further investment to become operative even if customer demand subsequently developed, and (3) would need to be rebuilt if, as is likely, later-arising consumer demand did not coincide with the geographical bounds of the initial installation.[18] *Id.* at 43, 46-52. In other

---

[17] Neither the Petition Declaration nor the Complaint Declaration specify precisely when the Licenses were initially granted. Nor did Van Wagenen explicitly specify at the Hearing the exact date the Licenses were first granted. *See* TR (Van Wagenen) at 24-26, 28-43. The court has inferred that the Licenses were granted in 1998 because, according to Van Wagenen, the Licenses were "granted for ten years, subject to renewal," and "were renewed back in 2008." *Id.* at 39.

[18] The parties dispute whether, under the Communications Act and the cases and regulations implementing and interpreting it, a Commission licensee's network build-out after the expiry of a termination deadline can shield licenses from termination or revive licenses that have been terminated. *See supra* note 7. As will become clear below, it is unnecessary to resolve this question here. No matter whether Debtors currently hold an interest in the Licenses that can be revived or shielded through further construction, or if instead they merely hold an interest in, *inter alia*, the right to seek reconsideration of and appeal an adverse decision by the Commission, that interest is property of the bankruptcy estate and therefore falls within this court's jurisdiction. Code § 541(a)(1); 28 U.S.C. §§ 1334, 157(b)(2)(A).

words, constructing these links would serve no business purpose other than securing compliance with the Safe Harbor. *Id*. at 47. Consequently, Debtors have instead pursued market-based solutions to cater to their existing customer base. *Id*. at 79-80.

On and before June 1, 2012, Debtors filed individualized showings for each License with the Commission, arguing that although nearly all the Licenses do not fall within the Safe Harbor, they nonetheless comply with the Substantial Service Standard. Petition Declaration ¶¶ 33, 35; TR (Van Wagenen) at 52-53.

### C. The Cash Collateral Order

On August 21, 2012, the court entered its *Final Order (I) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code and (II) Providing Adequate Protection to Secured Parties Pursuant to Sections 361, 362, and 363 of the Bankruptcy Code* (the "Cash Collateral Order").[19] The Cash Collateral Order and the Plan Support Agreement provide that Debtors' authority to use cash collateral will terminate upon five business days' prior written notice if "the [Commission] issues, with respect to the [Licenses], a binding adverse order, ruling or determination: (i) finding that [Debtors] do not meet the [S]ubstantial [S]ervice conditions; and/or (ii) denying [Debtors'] request for an extension or waiver of the [S]afe [H]arbor[] construction rules." Plan Support Agreement § 7.1(a)(vi). *See also* Cash Collateral Order § 4; Complaint Declaration ¶ 4.

### D. Defendant Allegedly Threatens to Cancel Debtors' Licenses

On August 20, 2012, Debtors received word that Defendant was likely to terminate a large portion of the Licenses for failure to satisfy the Safe Harbor by the June 1, 2012 deadline. Complaint Declaration ¶ 3; *see also* TR (Van Wagenen) at 61. By the terms of the Cash

---

[19] This document may be located in the underlying bankruptcy proceeding, cause no. 12-44027-dml-11, at docket no. 219.

9

Collateral Order and the Plan Support Agreement, this would eliminate Debtors' financing in chapter 11. *See* Plan Support Agreement § 7.1(a)(vi); Cash Collateral Order § 4; Complaint Declaration ¶ 4. This, Debtors argue, would in turn completely derail their reorganization, and force Debtors to liquidate. TR (Van Wagenen) at 62-63. Debtors therefore filed this adversary proceeding and the Motion seeking a determination that the automatic stay of Code section 362(a) applies to any action Defendant may take with respect to the Licenses during the pendency of the chapter 11 case, and that Code section 362(b)(4)'s exception from the automatic stay for actions brought by government entities does not apply to an act by the Commission to divest Debtors of the Licenses. Alternatively, Debtors seek an injunction under Code section 105(a) preliminarily and permanently enjoining the actual termination of any License until Debtors have exhausted all avenues of administrative and appellate review of the Commission's actions, and a final, non-appealable order regarding the Licenses' status has been entered. Specifically, Debtors request that the Commission be enjoined from including a termination clause in its denial of Debtors' extension request (in the event a denial should issue) to the effect of "Accordingly, the Licenses, as outlined in Appendix __, TERMINATED AUTOMATICALLY on [date]," or, if any such clause is included, that the effect of such clause be stayed until Debtors exhaust their administrative and appellate remedies.

Defendant opposes the Motion, citing the need to preserve its congressionally-mandated authority to regulate the telecommunications industry. Moreover, Defendant maintains that the Licenses may have already terminated automatically as of June 1, 2012 by virtue of Debtors' failure to satisfy the Safe Harbor/Substantial Service Standard.

## II. DISCUSSION

*A. Whatever Rights Debtors Have in the Licenses are Part of the Bankruptcy Estate*

Whether or not the Licenses terminated on June 1, 2012,[20] any rights that Debtors have in the Licenses constitute property of Debtors' bankruptcy estate.

If the Licenses have not been terminated, then it is clear they are part of the estate. The Code defines the estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case," save for exceptions not relevant here. Code § 541(a)(1). Courts must interpret this definition expansively to effectuate Congress's intent to encourage reorganizations and protect creditors. *E.g.*, *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983) (citing H.R. Rep. No. 95-595, p. 367 (1977); S. Rep. No. 95-989, p. 82 (1978)). Furthermore, case law demonstrates as a general matter that licenses issued by the Commission constitute part of the estate when the licenseholder declares bankruptcy. *See In re Nextwave Pers. Commc'ns Inc.*, 244 B.R. 253, 267 (Bankr. S.D.N.Y. 2000); *Shimer v. Fugazy (In re Fugazy Express, Inc.)*, 114 B.R. 865, 869-71 (Bankr. S.D.N.Y. 1990). As such, this court has jurisdiction over the Licenses pursuant to 28 U.S.C. § 1334(e).[21]

---

[20] At this juncture, the court need not decide whether the Licenses terminated automatically on June 1, 2012. At the Hearing, Defendant conceded that if Debtors' failure to satisfy the Safe Harbor/Substantial Service Standard was due to circumstances beyond its control, then the Licenses did not automatically terminate on June 1, 2012, and Debtors would have some cognizable interest in the Licenses. *See* TR at 128-29; *see also* 47 C.F.R. § 1.946(e)(1). Finding and concluding that the Licenses did or did not automatically terminate on the deadline would require this court to determine, *inter alia*, whether or not exigent circumstances existed at the time Debtors applied for either a waiver of the Commission's safe harbor rules or an extension of time. This would require the court to do exactly what Defendant argues this court lacks the power to do: adjudicate Debtors' rights vis-à-vis the Licenses on the basis of information and expertise assertedly beyond this court's ken. *See In re FCC*, 217 F.3d 125, 135 (2d Cir. 2000). Deference to the Commission on this issue is at least appropriate, whether or not legally required.

[21] "The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction--

> (1) of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate . . . ."

28 U.S.C. § 1334(e).

28 U.S.C. § 157 in turn provides that bankruptcy cases over which the district court exercises exclusive jurisdiction may be referred to the bankruptcy court. Such reference has been made in this district. N.D. Tex. Misc. Rule 33.

11

Furthermore, as Defendant conceded at the Hearing,[22] even if, notwithstanding Debtors'

April request, the Licenses terminated automatically on June 1, 2012, (1) Debtors' right to an

official determination by Defendant of that fact, (2) Debtors' right to seek reconsideration by the

full Commission of any adverse decision vis-à-vis the Licenses, and (3) Debtors' right to appeal

any decision terminating the Licenses to the D.C. Circuit would also qualify as property of the

estate.  "The Code provides that *all* interests of the debtor in rights of action be included as

property of the estate under section 541(a)(1)."  COLLIER ON BANKRUPTCY ¶ 541.07 (16th ed.

2012) (emphasis in original) (citations omitted).  Thus, this court has jurisdiction and authority to

protect Debtors' rights in the Licenses, including Debtors' right to seek review of their

termination.

### B. Defendant's Threatened Termination of the Licenses Does Not Violate the Automatic Stay

Debtors argue that if Defendant terminates the Licenses, its action would violate the

automatic stay.  *See* Code § 362(a).  The filing of a chapter 11 petition "operates as a stay,

applicable to all entities," of certain actions that could otherwise be undertaken against the

debtor.  *Id.*  In particular, Debtors rely on Code section 362(a)(1), which stays "the

commencement or continuation . . . of a judicial, administrative, or other action or proceeding

against the debtor . . ." as well as section 362(a)(3), which stays "any act to obtain possession of

property of the estate or of property from the estate or to exercise control over property of the

estate."

Debtors' arguments are unavailing.  First, it is questionable whether section 362(a)(1)

applies.  Section 362(a)(1) only stays "the commencement or continuation . . . of a judicial,

administrative, or other action or proceeding *against* the debtor" (emphasis added).  The record

demonstrates that Debtors' application to Defendant seeking either a waiver of the Commission's

---

[22]    *See* TR at 137.

Safe Harbor rules or an extension of time to satisfy the Substantial Service standard was an action brought *by*, not against, the debtor. *See* Petition Declaration ¶ 32. Thus, insofar as Debtors' argument relies on Code section 362(a)(1), it fails, even though the result of the proceedings before the Commission could be a determination that the Licenses are terminated.

Secondly, and more importantly, assuming that the threatened terminations fall within the terms of Code section 362(a)(3), filing bankruptcy "does *not* operate as a stay . . . of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power." Code § 362(b)(4) (emphasis added). Although governmental actions brought for predominantly pecuniary purposes are not excepted from the automatic stay,[23] Defendant's decision regarding whether or not the Licenses are or should be terminated for non-compliance with the Substantial Service Standard lies within the heart of Defendant's police and regulatory power.[24] As case law

---

[23]     Code § 362(b)(4). This doctrine is known as the "pecuniary interest test." *E.g.*, *Trinity Meadows Raceway, Inc. v. Texas Racing Comm'n (In re Trinity Meadows Raceway, Inc.)*, Bankruptcy No. 97-41392-DML-7, Adversary No. 06-04165, 2007 WL 2713920 at *6 (Bankr. N.D. Tex. Sept. 11, 2007), *aff'd* 306 F. App'x 853 (5th Cir. 2009); *In re Spookyworld, Inc.*, 346 F.3d 1, 9 (1st Cir. 2003); *Chao v. Hosp. Staffing Servs.*, 270 F.3d 374, 385 (6th Cir. 2001); *NLRB v. Cont'l Hagen Corp.*, 932 F.2d 828, 833 (9th Cir. 2001).

    Notwithstanding Debtors' argument to the contrary, the record reveals no basis for concluding that the Commission's threat to terminate the Licenses is motivated by pecuniary gain. Rather, the Commission seeks to ensure that Debtors comply with the Safe Harbor. *See infra* note 24. The Commission's intended actions are therefore not stayed under Code section 362.

[24]     Debtors contend that the exception is inapplicable because the Commission's threatened termination of the Licenses would not protect the public health and safety. This reasoning reflects an overly narrow view of section 362(b)(4). While Debtors are correct that Congress intended that section 362(b)(4) be narrowly construed, *see, e.g.*, *McMullen v. Sevigny (In re McMullen)*, 386 F.3d 320, 325 (1st Cir. 2004) (citation omitted), "it is the *entitlement* to invoke an exception that must be narrowly construed. Once an entity qualifies for an exception to the stay, the court must ensure that entity receives the benefit Congress intended." *In re Mirant Corp.*, 314 B.R. 347, 353 n.13 (Bankr. N.D. Tex. 2004) (emphasis in original) (citation omitted). Case law makes clear that agencies qualify for the police and regulatory exception when they bring actions primarily intended to bring entities into compliance with applicable regulations, as Defendant intends here. In *Trinity Meadows*, this court held that the Texas Racing Commission ("TRC") qualified for the 362(b)(4) police and regulatory exception, 2007 WL 2713920 at *3-7, and the Fifth Circuit affirmed, *see* 306 F. App'x 853, even though the power to regulate wagering on horse racing does not directly implicate health or safety per se. This is because "[Code] § 362(b)(4) . . . allows a 'governmental unit' to bring or continue actions against a debtor to prevent or stop violations of law affecting matters of public health, safety, *or welfare*." *E.g.*, *In re Nortel Networks, Inc.*, 669 F.3d 128, 130 (3d Cir. 2011)

demonstrates, "the [Commission's] regulatory decisions" as a general matter "fall within §

362(b)(4)," *In re FCC*, 217 F.3d at 138 n.8, and therefore are exempt from the automatic stay.[25]

---

(emphasis added)). Where, as here, proposed regulatory actions are intended to improve the public welfare, effectuate public policy, or further primarily nonpecuniary purposes, they fall within the scope of the exception. *See Trinity Meadows*, 2007 WL 2713920 at *6. *See also Commonwealth Oil Ref. Co. v. EPA (In re Commonwealth Oil Ref. Co.)*, 805 F.2d 1175, 1186 (5th Cir. 1986) ("The EPA's enforcement action . . . is an attempt to bring CORCO into compliance with [regulatory laws]* and 'falls squarely within the [government's] police and regulatory powers . . . . No more obvious exercise of the [government's] power to protect the health, safety, *and welfare* of the public can be imagined . . .' As such, we find that it falls squarely within the § 362(b)(4) police and regulatory exception to the automatic stay." (emphasis added)) (quoting *Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267, 274 (3d Cir. 1984)).

[25]      Code section 362(b)(4) was amended in 1998 to provide that the Code does not operate as a stay

> under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit or any organization *exercising authority under the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993* [the "Convention"], to enforce such governmental unit's or organization's police and regulatory power . . . .

(emphasis added).

> The purpose of the amendment was (i) to make it clear that any organization exercising authority under the . . . Convention would be entitled to the benefits of the section, and (ii) to extend the application of former (b)(4) and (b)(5) to acts under § 362(a)(3) and (a)(6) in addition to (a)(2) and (a)(1) that were previously excepted under the prior provisions.

Norton Bankruptcy Law and Practice 3d, at 337.

Debtors argue that the effect of this amendment is to render Defendant's intended actions ineligible for the exception to the automatic stay. There are two ways to interpret Debtors' argument – one simplistic, and one sophisticated. Both, however, fail. The court will dispose of each in turn.

Debtors contend in their brief that "the conventional, plain language of the amendment's text confirms that it should apply *only* to police and regulatory actions taken pursuant to the . . . Convention." Reply, *supra* note 5, at 3. If by this Debtors mean that a government agency must be acting pursuant to the Convention in order to qualify for the exception for actions that otherwise would be stayed under section 362(a)(3), case law amply demonstrates they are incorrect. *E.g.*, *Suter v. District of Columbia (In re Suter)*, No. Civ.A.2005-2118, 2005 WL 2989336, at *4-5 (D. Md., Nov. 7, 2005); *U.S. ex rel. Fullington v. Parkway Hosp., Inc.*, 351 B.R. 280, 290 n.9 (E.D.N.Y. 2006) (indicating that "governmental unit[s]" are distinct from "organization[s] exercising authority under the [Convention]," and that section 362(b)(4) applies to both). "The legislative history of this amendment leaves no doubt that, notwithstanding the ambiguous language of the amendment, there was no intent by Congress to eliminate the application of the section to governmental police and regulatory power in general." *In re Nease*, 391 B.R. 470, 472-73 (Bankr. M.D. Fla. 2008).

The alternative reading of Debtors' argument is as follows: section 362(b)(4) does not except license termination proceedings from the automatic stay because the amendment was not intended to significantly expand the reach of that section to allow regulatory agencies to interfere as they please with property of the bankruptcy estate. In other words, argue Debtors, the amendment should not be read to "allow a

*C. Injunctive Relief is Warranted*

Notwithstanding that Defendant's threatened actions are excepted from the automatic stay, the evidence warrants an injunction barring Defendant from cancelling and reauctioning the Licenses until a final, non-appealable order adjudicating Debtors' rights with respect to the Licenses has been issued.

Code section 105(a) permits the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Code.  Although section 105(a) does not give the court a blank check to "create substantive rights that are otherwise unavailable under applicable law" or act as "a roving commission to do equity,"[26]  the section does permit the court to take actions necessary to "protect the integrity of the bankrupt's estate"[27] and enjoin actions

---

governmental unit to do anything, and take any action it wanted" against a bankrupt debtor, "short of actually enforcing a money judgment."  Reply, *supra* note 5, at 4 n.11.  Instead, insofar as the amendment applies to the types of governmental actions described in sections 362(a)(3) and (a)(6), it should be read to exempt from the automatic stay only those actions most analogous to acts a governmental unit would take pursuant to the Convention.

This argument too is unpersuasive.  This court has held, and the Fifth Circuit agreed, that, even prior to Congress's amendment of 362(b)(4) in 1998, a regulatory agency seeking to terminate a license could do so without violating section 362(a)(3).  *Trinity Meadows*, 2007 WL 2713920 at *3-5; *aff'd* 306 F. App'x 853. If Defendant could terminate the Licenses prior to the amendment, then it can certainly take that same action now that Congress has broadened the police and regulatory exception to the automatic stay (subject, of course, to this court's power to enjoin regulatory actions under section 105(a)).

Debtors attempt to support their argument by citing *Maricopa County v. PMI-DVW Real Estate Holdings, LLP (In re PMI-DVW Real Estate Holdings LLP)*, 240 B.R. 24, 30-32 (Bankr. D. Ariz. 1999), in which the court held that the inclusion of subsection (a)(3) within the scope of section 362(b)(4) did not expand the reach of the exception to include a governmental unit's taking of property by eminent domain. Because eminent domain is "different than," and "[not] a valid exercise of," a governmental unit's "traditional police or regulatory power," the court held it is not excepted from the automatic stay.  *Id.*  In *Maricopa County*, however, there was "no mention of a specific public health, safety or welfare issue which would traditionally involve the government's police and regulatory power," such as the need to condemn property subject to eminent domain as a fire hazard.  *Id.* at 31-32 (citing *Manuel v. City of Jacksonville (In re Blunt)*, 210 B.R. 626 (Bankr. M.D. Fla. 1997)).  Here, by contrast, Defendant would be acting to serve the public welfare by terminating licenses where it finds the licensee not to be in compliance with applicable law. This falls squarely within Defendant's congressionally-mandated police and regulatory powers.  *See supra* note 24.

[26]    *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986); *accord* Collier on Bankruptcy ¶ 105.01[2] (16th ed. 2012).

[27]    *Bear v. Coben (In re Golden Plan of Cal., Inc.)*, 829 F.2d 705, 713 (9th Cir. 1986).

15

that "might impede the reorganization process."[28]  Because Defendant's intended actions

threaten both the bankruptcy estate and Debtors' reorganization prospects, injunctive relief is

appropriate in this case.

Even though Defendant's intended actions are excepted from the automatic stay by virtue

of Code section 362(b)(4), that does not preclude the court from issuing the injunctive relief

requested.  A bankruptcy court may utilize section 105 to "enjoin actions that are excepted from

the automatic stay . . . 'in exceptional circumstances.'"  *E.g.*, *Mirant Corp. v. Potomac Elec.*

*Power Co. (In re Mirant Corp.*), 378 F.3d 511, 523 (5th Cir. 2004) (quoting *In re Cajun Elec.*

*Power*, 185 F.3d 446, 457 n.18 (5th Cir. 1999)); *Commonwealth Oil*, 805 F.2d at 1188 n.16

(listing cases from numerous jurisdictions).

A movant requesting injunctive relief under Code section 105(a) must satisfy the

traditional four-part test for an injunction: (1) likelihood that the movant will prevail on the

merits; (2) irreparable injury; (3) balance of the equities favoring the movant; and (4) a

demonstration that the injunction would serve the public interest.  *E.g.*, *Commonwealth Oil*, 805

F.2d at 1188-89; COLLIER ON BANKRUPTCY ¶ 105.03[1] (16th ed. 2012).  "A preliminary

injunction 'is an extraordinary and drastic remedy, not to be granted routinely, but only when the

movant, by a clear showing, carries a burden of persuasion.'"  *Black Fire Fighters Ass'n of*

*Dallas v. City of Dallas, Texas*, 905 F.2d 63, 65 (5th Cir. 1990) (quoting *Holland Am. Ins. Co. v.*

*Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).  For the reasons described below, the

court concludes that Debtors have satisfied this standard.

### 1. Likelihood of Success on the Merits

#### a. The Relevant Merits Inquiry

---

[28]    *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93 (2d Cir. 1988)
(citations omitted).

The relevant inquiry for the "likelihood of success on the merits" element depends on "the purpose of the requested injunction." COLLIER ON BANKRUPTCY ¶ 105.03[1][a] (16th ed. 2012). "[T]he likelihood of success argument will track closely the bankruptcy right sought to be vindicated." *Id.* There is some confusion regarding what "likelihood of success on the merits" means in a case where, as here, a trustee or debtor in possession seeks only limited injunctive relief. Defendant argues that the court should inquire whether Debtors would be likely to succeed upon review of an adverse ruling by the full Commission or the D.C. Circuit if Defendant were to terminate the Licenses. Debtors appear to agree, but also suggest that the "merits" refer to the probability of a successful plan of reorganization.

The court concludes that both parties are incorrect. In this case, "[p]robability of success means that the Debtor[s] [are] likely to succeed in *this* lawsuit," *i.e.*, this adversary proceeding, "*not* that the Debtor[s] [are] likely to overturn" Defendant's ultimate termination of the Licenses on reconsideration by the full Commission or on appeal to the D.C. Circuit.[29] The relief the court grants here does not require it to impede Defendant's authority in the telecommunications arena by second-guessing its expert judgment, as would be necessary if this court were to pass on Debtors' likelihood of success on appeal. *See In re FCC*, 217 F.3d at 135.

*Commonwealth Oil*, 805 F.2d at 1189, is not to the contrary. The Fifth Circuit there held that the correct "merits" inquiry was "whether [the debtor-in-possession] would be likely to succeed *in the underlying enforcement action*" brought by the Environmental Protection Agency. *Id*. (emphasis added). The court stated that

> [t]he inquiry for a preliminary injunction necessarily focuses on the outcome of a later proceeding, at which time the merits of the questions giving rise to the

---

[29] *Go West Entm't v. N.Y. State Liquor Auth. (In re Go West Entm't)*, 387 B.R. 435, 440 (Bankr. S.D.N.Y. 2008) (second emphasis added, first emphasis in original); *accord Wilner Wood Prods. Co. v. Maine Dep't of Env. Prot.*, 128 B.R. 1, 4 n.4 (D. Me. 1991).

litigation will be decided. [The debtor-in-possession's] characterization of the 'merits' for purposes of the preliminary injunction analysis erroneously substitutes the question before the court at the preliminary injunction hearing for the merits of the case that must be ultimately decided. *Id.*

*Commonwealth Oil* is distinguishable. Whereas the debtor-in-possession in *Commonwealth Oil* "sought an order 'staying *any* enforcement or revocation *proceeding*'" against it, *id.* at 1181 (first emphasis in original, second emphasis added), Debtors do not ask this court to stay the proceedings before the Commission; rather, they merely ask this court to preserve their right to litigate to a conclusion their entitlement to retain the Licenses. Here, the court acts only to preserve Debtors' rights from possible impairment should they, following an initial loss, prevail in the review process. In other words, to the extent this court usurps *any* function the Commission would otherwise perform, it is only the determination that a stay pending appeal is appropriate in this case – a decision necessarily influenced by the landscape of Debtors' chapter 11 proceedings as well as any expectation of Debtors' success on appeal. Whether Debtors will ultimately be successful or unsuccessful on appeal is irrelevant to the question of whether this court may stay Defendant from redistributing the Licenses in the interim. The relevant "merits" question in this case is therefore not whether Debtors are likely to prevail on appeal, but rather whether this court is authorized and likely to grant the requested relief. *See* Collier On Bankruptcy ¶ 105.03[1][a] (16th ed. 2012) ("In connection with the 'likelihood' argument, many courts have looked to the purpose of the requested injunction . . . *the likelihood of success argument will track closely the bankruptcy right sought to be vindicated*." (emphasis added)).

Nor is the question whether Debtors can show a reasonable likelihood of a successful reorganization. *See Vitro, S.A.B. de C.V. v. ACP Master, Ltd. (In re Vitro, S.A.B. de C.V.)*, 455 B.R. 571, 580-81 (Bankr. N.D. Tex. 2011); *Go West*, 387 B.R. at 440; *Wilner*, 128 B.R. at 4 n.4.

18

Because the right that Debtors seek to vindicate is the right to contest on review an adverse decision regarding the Licenses, the relevant inquiry is whether Debtors have "a likelihood of success on [their] argument that the bankruptcy court can enjoin a . . . regulatory proceeding" under the circumstances. *Wilner*, 128 B.R. at 4 n.4.

### b. Debtors Have Demonstrated Likelihood of Success on the Merits

Debtors have successfully made such a showing. There is ample authority for the proposition that a bankruptcy court may, in the proper circumstances, enjoin a federal administrative agency.[30] As demonstrated above, both the Licenses and Debtors' right to seek review of a termination decision constitute property of the estate, and consequently are subject to this court's jurisdiction. *See* 28 U.S.C. § 1334(e). "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (citation omitted). Thus, although the Communications Act grants the authority to regulate spectrum licenses solely to the Commission, *e.g.*, *In re FCC*, 217 F.3d at 131, once the holder of a license regulated by the Commission declares bankruptcy, the commencement of that bankruptcy case results in *shared* jurisdiction over the licenses between Defendant and the bankruptcy court: the Commission exercises jurisdiction by virtue of its statutorily-granted regulatory authority, while the bankruptcy court exercises jurisdiction pursuant to its control over property of the estate. Interpreting the U.S. Code to provide for shared jurisdiction between the

---

[30] *See, e.g.*, *Mirant*, 378 F.3d at 522-23; *NLRB v. Superior Forwarding, Inc.*, 762 F.2d 695, 699 (8th Cir. 1985) (affirming bankruptcy court's injunction against NLRB); *Hunt v. CFTC (In re Hunt)*, 93 B.R. 484, 491–98 (Bankr. N.D. Tex. 1988) (enjoining Commodities Futures Trading Commission); *Cooper v. ICC (In re Bulldog Trucking, Inc.)*, 150 B.R. 912, 916 (W.D.N.C. 1992) (enjoining Interstate Commerce Commission); *Richmond Paramedical Servs. v. HHS (In re Richmond Paramedical Servs., Inc.)*, 94 B.R. 881, 882 (Bankr. E.D. Va. 1988) (enjoining Department of Health and Human Services); *Hudtwalker v. DOE (In re Vantage Petroleum Corp.)*, 25 B.R. 471, 477 (Bankr. E.D.N.Y. 1982) (enjoining Department of Energy).

bankruptcy court and Defendant in such circumstances is the best way to give effect to the

congressional grants of authority to both the Commission and the bankruptcy court.  *See Mirant*,

378 F.3d at 522-23 ("When faced with a conflict between two statutes, courts must interpret

them to give effect to both statutes.") (citing *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

While the court will defer to Defendant's regulatory objectives and expertise, Code section 105

nonetheless permits the court to issue any order necessary to preserve the property of Debtors'

bankruptcy estate, including enjoining Defendant from redistributing the Licenses before its

orders become final and non-appealable.

That the bankruptcy court as well as the Commission has (1) an interest in disposition of

the Licenses and (2) the jurisdiction and competence to exercise authority respecting that interest

is illustrated by other instances where relations between a debtor and a regulatory authority are

subject to bankruptcy court oversight.  For example, in a bankruptcy proceeding between a

regulatory agency and a trustee or debtor, a bankruptcy court may require submission of a

proposed compromise or settlement for judicial approval pursuant to FED. R. BANKR. P. 9019.[31]

Likewise, a debtor in possession must seek bankruptcy court approval before it can sell licenses

the sale of which would otherwise be regulated solely by an administrative agency.[32]

Moreover, the Communications Act and the regulations implementing it contemplate that

the effect of a Commission decision may be stayed pending reconsideration and appeal of

---

[31]    *See Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, LP*, 394 B.R. 325, 332 (S.D.N.Y. 2008)
(discussing Rule 9019 motion before bankruptcy court to approve settlement with the Commission); *In re
High Voltage Eng'g Corp.*, 397 B.R. 579 (Bankr. D. Mass. 2008); *In re U.E. Sys.*, No. 01-32791-HCD,
1992 WL 472113 (Bankr. N.D. Ind., Sept. 28, 1992).

[32]    *See Gross v. SES Americom, Inc.*, 213 F. App'x 166, 171-72 (4th Cir. 2007) (noting that sale of satellite
communications band license would require approval of both bankruptcy court and the Commission);
*Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 387-88, 392 (6th Cir. 1986) (affirming bankruptcy court
approval of trustee's sale of debtor's broadcasting licenses).  *Cf. In re Barnes*, 276 F.3d 927, 928 (7th Cir.
2002) (classifying liquor licenses as property of the bankruptcy estate, and therefore properly subject to the
bankruptcy court's jurisdiction, even though they "may not be transferred without the approval of the
state's Alcoholic Beverage Commission").

licensing decisions. *See* 47 C.F.R. §§ 1.102, 1.106(n), 1.115(h)(2); 47 U.S.C. § 402(c). Thus,

the court is not being asked to fashion any relief not already contemplated by the applicable

statutory and regulatory scheme. As a result, granting the requested injunction would not

impermissibly utilize Code section 105(a) to "create substantive rights that are otherwise

unavailable under applicable law." *See United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.

1986). Indeed, it is not uncommon for a bankruptcy stay to substitute for a stay pending

appeal.[33]

Finally, not only have other courts issued similar injunctions in factually analogous

circumstances,[34] courts have also issued or upheld injunctions far more potentially disruptive to

administrative agencies than the injunction requested here. In *Superior Forwarding*, for

---

[33]  *See, e.g., Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828-29 (9th Cir. 1994) ("Several bankruptcy courts have held that a debtor may use a Chapter 11 petition to avoid posting an appeal bond if satisfaction of the judgment would severely disrupt the debtor's business.") (citing *In re Sparklet Devices, Inc.*, 154 B.R. 544, 548-49 (Bankr. E.D. Mo. 1993); *In re Harvey*, 101 B.R. 250, 252 (Bankr. D. Nev. 1989); *In re Holm*, 75 B.R. 86, 87 (Bankr. N.D. Cal. 1987)). *But see In re Wally Findlay Galleries (N.Y.), Inc.*, 36 B.R. 849, (Bankr. S.D.N.Y. 1984) ("It is clear that the debtor did not file its petition to reorganize, but rather as a litigating tactic . . . to avoid the consequences of adverse state court decisions while it continues litigating. This court should not, and will not, act as a substitute for a supersedeas bond of state court proceedings."). Here, it is clear that Debtors filed bankruptcy for the legitimate purpose of restructuring their debt, not as a mere litigation tactic. *See* Petition Declaration ¶¶ 9-30; *In re SGL Carbon Corp.*, 200 F.3d 154, 165-66 (3d Cir. 1999) ("When financially troubled petitioners seek a chance to remain in business, the exercise of [bankruptcy] powers [under chapter 11] is justified.").

[34]  *See Hunt*, 93 B.R. at 498 ("Accordingly, this Court finds that issuance of an injunction that remains in effect until the earlier of the Disclosure Statement hearing in these proceedings *or the final prosecution of the appeal of the Minpeco judgment* is fully warranted." (emphasis added)); *Richmond Paramedical*, 94 B.R. at 883-84 (concluding that debtor's failure to exhaust administrative remedies did not preclude bankruptcy court from temporarily enjoining Department of Health and Human Services from excluding provider from participation in Medicare and Medicaid programs, even if bankruptcy court lacked authority to review HHS decisions before exhaustion of debtor's remedies).

*See also F.G.M. Assocs., Inc. v. City of East Providence (In re F.G.M. Assocs., Inc.)*, 17 B.R. 765, 768 (Bankr. D.R.I. 1982), *remanded on other grounds by In re F.G.M. Assocs., Inc.*, 21 B.R. 442 (B.A.P. 1st Cir. 1982). *Go West*, 387 B.R. at 442-45, and *Wilner*, 128 B.R. at 2-4, denied injunctive relief in circumstances similar to those present in *F.G.M.*, but *Go West* and *Wilner* are distinguishable from the instant case. Unlike the Commission, the agencies sought to be enjoined in *Go West* and *Wilner* were state agencies. The courts in *Go West* and *Wilner* ruled that they lacked the authority to issue the requested injunctive relief because of principles of comity and federalism, as well as the importance of "avoid[ing] needless friction between Federal and State courts." *Go West*, 387 B.R. at 442-45; *accord Wilner*, 128 B.R. at 2-4. In any event, *Go West* and *Wilner* are merely persuasive authorities that do not bind this court.

example, the court affirmed a bankruptcy court order enjoining the NLRB from proceeding with hearings on unfair practice charges *entirely*, rather than merely pending the entry of a final non-appealable order, on the grounds that the regulatory proceedings would threaten the assets of the debtor's bankruptcy estate.  762 F.2d 695 at 696-97, 698-701.  *See also*, *e.g.*, *Bulldog Trucking*, 150 B.R. at 916 (enjoining Interstate Commerce Commission from enforcing regulations against certain actors and declaring the regulations "NULL and VOID as to the [t]rustee and the rate undercharge claims in this case" (emphasis in original)).  If the court is empowered to issue injunctions more drastic than that which Debtors request, then it certainly has the power, if it deems necessary and appropriate, to enjoin Defendant from declaring the Licenses terminated and redistributing them until Debtors have exhausted their administrative and appellate remedies.

 This court's exercise of its jurisdiction to protect Debtors' rights in the Licenses need not frustrate the Commission's proceedings.  This court does not propose to second-guess the Commission or to supplant it in deciding whether Debtors should retain the Licenses.  By restraining Defendant from disposing of the Licenses in derogation of any of Debtors' rights before the status of those rights is finally decided, this court merely acts to ensure that Debtors do not wrongfully lose property of potentially substantial value to creditors, the protection of which is essential to the reorganization process.  In doing so, the court does not tread upon the Commission's adjudicatory functions or usurp Defendant's ultimate regulatory authority, such as by ordering it to find that Debtors have satisfied the Substantial Service Standard.  *See In re FCC*, 217 F.3d at 135 ("The FCC need not defend its regulatory calculus in the bankruptcy court . . . ." (emphasis removed)).  "It is not the intent of this court to adjudicate the respective rights of [Defendant] and the Debtor[s] vis-[à]-vis the question of the [Licenses], but rather to maintain

the status quo pending a determination of that issue" by the full Commission and the D.C.

Circuit. *F.G.M.*, 17 B.R. at 768.[35]

Granting an injunction will not, as Defendant argues, amount to granting Debtors a de facto license in derogation of Defendant's exclusive regulatory authority. Defendant is still able to ultimately terminate the Licenses if that is the conclusion it reaches through its adjudicatory process, subject only to review and reconsideration by the Commission and appellate review by the D.C. Circuit. The requested injunction will only temporarily delay the effect of such termination until appellate review is complete.

Therefore, the court *may* enjoin Defendant from declaring the Licenses terminated pending a final, non-appealable order. The court now turns to the remaining elements required to support injunctive relief to determine whether it *should*. *See Vantage Petroleum*, 25 B.R. at 476.

### 2. Irreparable Injury

Defendant does not dispute that Debtors will be severely injured if Defendant redistributes the Licenses. The question is whether that injury is sufficiently irreparable to

---

[35] It is helpful in this regard to distinguish the Commission's adjudicatory powers from its executive powers. The court does not wish to usurp the Commission's *adjudicatory* authority to determine the status of the Licenses. The court only seeks to delay the Commission from *executing* whatever judgment it reaches after completing its initial adjudication respecting the Licenses. The court is certainly aware that the lines between the executive, "quasi-legislative," and "quasi-judicial" powers of an administrative agency are blurry, and that courts and commentators have warned against relying too heavily upon potentially ephemeral distinctions between the three in other contexts. *See, e.g., Morrison v. Olson*, 487 U.S. 654, 689 n.28 (1988); *FTC v. Ruberoid Co.*, 343 U.S. 470, 487-88 (1952) (Jackson, J., dissenting) ("Administrative agencies have been called quasi-legislative, quasi-executive or quasi-judicial, as the occasion required . . . all recognized classifications have broken down, and 'quasi' is a smooth cover which we draw over our confusion as we might use a counterpane to conceal a disordered bed."). Nevertheless, the Code itself privileges the adjudicatory functions of governmental bodies over their executive functions: section 362(b)(4) excepts adjudications pursuant to a governmental body's police or regulatory power from the automatic stay, but not attempts to execute money judgments. *See supra* notes 23-24. The bankruptcy court may possess the *authority* to enjoin both enforcement and adjudicatory activities, *see Vantage Petroleum*, 25 B.R. at 476, but utilizing Code section 105(a) in this case to allow the Commission to *adjudicate* Debtors' rights vis-à-vis the License but not *execute* its judgment until Debtors have exhausted their administrative and appellate remedies is consistent with the overall structure of the Code, and does not impair the Commission's decision-making authority.

23

warrant injunctive relief. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.") (emphasis in original) (quoting *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

The record demonstrates that the threatened harm is indeed irreparable. As described above, if the Commission deems the Licenses terminated, Debtors will almost certainly lose access to cash collateral. This danger is not speculative, theoretical, or remote;[36] it is provided for by the plain terms of the Cash Collateral Order and the Plan Support Agreement,[37] and the Commission has already made concrete threats to declare those Licenses terminated. Complaint Declaration ¶ 3; TR (Van Wagenen) at 61.

Debtors have argued, and Defendant does not dispute, that it would be nearly impossible for Debtors to reorganize and continue their business without financing. *See* TR (Van Wagenen) at 62-63. Moreover, if Defendant reallocates the Licenses to other backhaul providers while Debtors' appeal to the full Commission or the D.C. Circuit is pending, then if Debtors subsequently prevail on appeal, they would have to expend their limited resources in bankruptcy to reclaim the Licenses from subsequent purchasers, which would further jeopardize their

---

[36] *See generally Goldie's Bookstore, Inc. v. The Superior Court of the State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) ("Speculative injury does not constitute irreparable injury.") (citing 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948 at 436 (1973)); *Holiday Inns of Am., Inc. v. B&B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969) ("The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat; it may not be used simply to eliminate a possibility of a remote future injury. . . .")

[37] *See* Plan Support Agreement § 7.1(a)(vi); Cash Collateral Order § 4; Complaint Declaration ¶ 4.

reorganization prospects. The loss of access to cash collateral and the potential cessation of operations are exactly the sorts of injury for which compensatory damages are insufficient. *See, e.g.*, *In re Talsma*, Nos. 10-43790-dml-11, 10-43791-rfn-11, 10-43792-dml-11, 2010 WL 5269902, at *2 (Bankr. N.D. Tex. 2010); *In re Worldspace, Inc.*, No. 08-12412 (PJW), 2008 WL 8153638, at *1 (Bankr. D. Del. Nov. 10, 2008). Thus, Debtors face irreparable injury in the absence of injunctive relief.[38]

Defendant asserts that the harm to Debtors would be reparable because even if the Commission were to terminate and reauction the Licenses, the Commission could reclaim and return the Licenses to Debtors if the full Commission or the D.C. Circuit were to later reverse the initial termination. *See* TR at 131. However, there is no evidence in the record that would allow the court to find that the Commission could indeed claw back the Licenses, let alone that it could do so expeditiously enough to not seriously disrupt or even destroy Debtors' business by delay and uncertainty. Defendant presented no evidence at the Hearing regarding how long reclaiming the terminated licenses would take. *See* TR at 121-22, 130-31. Nor did it present evidence regarding whether good faith purchasers, understandably reluctant to give back their newly bought licenses, could be forced to quickly return the Licenses to the Commission. *Id.* Returning the Licenses could take years if a substitute licensee chose to resist the Commission. In the interim, Debtors would lack assets critical to their business. Furthermore, even assuming

---

[38]     Defendant argues that Debtors' injuries are self-inflicted, as they are a result of (1) Debtors' choice to risk license termination and pursue market-based solutions, rather than use the resources at their disposal to satisfy the Safe Harbor, and (2) Debtors' decision to enter into the Cash Collateral Order and the Plan Support Agreement, which conditioned Debtors' financing on the continued validity of the Licenses, knowing that a substantial majority of the Licenses failed to satisfy the Safe Harbor. Thus, Defendant argues, Debtors' injuries are not irreparable. *See Salt Lake Tribune Pub. Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003); *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995); *San Francisco Real Estate Investors v. Real Estate Inv. Trust of Am.*, 692 F.2d 814, 818 (1st Cir. 1982). Whatever the merits of this argument outside the bankruptcy context, Debtors, by filing bankruptcy, have undertaken fiduciary duties to their creditors. It would be inequitable to diminish innocent creditors' ultimate recovery on the basis of Debtors' prepetition conduct in this case, even if that conduct would otherwise be sufficient to taint Debtors' request for relief.

that the Commission could promptly return all of the Licenses to Debtors, the initial termination could still result in Debtors losing the use of cash collateral. It is therefore entirely conceivable that by the time Defendant could recover the Licenses, there would be no extant Debtors to which to return them. The court is therefore satisfied that Debtors have met their burden of persuasion on the issue of irreparable harm.[39]

### 3. Balance of Equities

The potential harm to Debtors if this court does not issue an injunction far outweighs the possible harm to Defendant if injunctive relief issues. As described above, Debtors face the loss of cash collateral, and therefore the potential loss of their business, if Defendant redistributes the Licenses pending appeal. The possible death of Debtors' businesses is a consequence weightier than any harm a temporary stay could cause Defendant.

In contrast, the only harm Defendant faces and cites to this court is encroachment of its regulatory turf. *See* TR at 131-37; Objection, *supra* note 5, at 22-23. Although, in fact, the court's issuance of a stay merely protects estate property and the reorganization process without infringing on any area of Defendant's expertise, Defendant's counsel argued at the Hearing that granting an injunction could conceivably embolden other licensees to pursue similar injunctions

---

[39]    As noted above, the Communications Act and the regulations implementing it provide that Debtors could potentially obtain a stay pending appeal of an adverse decision respecting the Licenses to the full Commission and/or the D.C. Circuit. 47 C.F.R. §§ 1.115(h)(2), 1.102; 47 U.S.C. § 402(c). This does not obviate the need for a stay to issue from *this* court; to the contrary, it further supports granting the requested injunction. Neither the statute nor the regulations explicitly state whether or not Debtors would be required to post security as they pursued their appellate remedies, and, if so, how much, but it is likely that Debtors would be required to post a bond. *Cf.* FED R. CIV. P. 65(c). It is entirely possible that the bond amount would be sufficiently sizable to severely burden Debtors' estate, and thereby damage its reorganization prospects. *Cf. Marsch*, 36 F.3d at 828-29 (noting that "[s]everal bankruptcy courts have held" in the context of Code § 1112(b) "that a debtor may use a Chapter 11 petition to avoid posting an appeal bond if satisfaction of the judgment would severely disrupt the debtor's business," but only if the debtor cannot "satisfy the judgment with nonbusiness assets") (citing *Sparklet Devices*, 154 B.R. at 548-49; *Harvey*, 101 B.R. at 252; *Holm*, 75 B.R. at 87). This bolsters the court's conclusion that Debtors face irreparable injury, and that injunctive relief is warranted to preserve Debtors' right to appeal and their chances for a successful reorganization.

against Defendant in other bankruptcy courts. *See* TR at 136. The court finds this fear illusory. Bankruptcy is an extreme remedy that is unlikely to be elected by every entity seeking to delay a threatened license termination. Here, for instance, the court is satisfied that Debtors filed chapter 11 not as a litigation tactic solely designed to delay the Commission, but rather for the legitimate purpose of addressing its very real debt problems.[40]

### 4. The Public Interest

Again, it is not for this court to determine whether terminating or extending the Licenses would serve or disserve the public interest; that is for Defendant to decide and the D.C. Circuit to review. The only question before this court is whether or not granting a temporary stay prohibiting Defendant from redistributing the Licenses pending a final non-appealable order will serve the public interest.

Courts have often held that injunctions that facilitate reorganizations serve the public interest.[41] "Chapter 11 expresses the public interest of preserving the going-concern values of businesses, protecting jobs, ensuring the equal treatment of and payment of creditors, and if possible saving something for the equity holders." *Hunt*, 93 B.R. at 497 (citing H.R. Rep. No. 95-595, 340 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6296). As demonstrated above, Debtors' chances of successfully reorganizing will be jeopardized unless injunctive relief is granted. If Debtors were to liquidate, their employees and customers would be adversely affected. TR (Van Wagenen) at 67-70. Debtors' demise could also impact public services, such as emergency first responder networks. *Id*. at 69-70. By contrast, any impact on Defendant's

---

[40]     *See supra* note 33.

[41]     *E.g.*, *SAS Overseas Consultants v. Benoit*, No. Civ.A. 99-1663, 2000 WL 140611, at *5 (E.D. La. Feb. 7, 2000) (citing *Venzke Steel Corp. v. LLA, Inc. (In re Venzke Steel Corp.)*, 142 B.R. 183, 185 (Bankr. N.D. Ohio 1992); *Lazarus Burman Assocs. v. Nat'l Westminster Bank U.S.A. (In re Lazarus Burman Assocs.)*, 161 B.R. 891, 901 (Bankr. E.D.N.Y. 1993)).

ability to regulate the telecommunications industry in the public interest will be marginal given the limited scope of the injunction requested.

Thus, given the foregoing, an injunction should issue.

### III. CONCLUSION

The court, in its 9/27 Order, has tailored the granted injunction with care to avoid infringement of the Commission's adjudicatory function.[42]  While the court recognizes that agencies of government, whether courts or arms of the executive, are necessarily jealous of their turf, where, as here, Congress has accorded exclusive control respecting a category of property to two fora, it is incumbent on each to ensure the effective exercise of its statutory authority while allowing due deference to the range of expertise and legislatively commanded decision-making power of the other. In this case, the court does no more than protect the same authority it would have in the event of a proposed sale of the Licenses or their disposition by settlement.[43]  So long as Debtors have an interest in the Licenses, they may not be finally disposed of without the approval of this court.[44]  Once any decision of the Commission divesting Debtors of the Licenses is final and not subject to appeal, Debtors will have no interest in the Licenses and the stay provided by the 9/27 Order will automatically terminate.

For these and the other reasons stated in this memorandum opinion, to the extent provided in the 9/27 Order, the Motion is granted in part and otherwise denied.

---

[42]    *See supra* note 35.

[43]    *See supra* notes 31-32 and accompanying text.

[44]    The Commission may seek relief from the 9/27 Order at any time if the facts warrant.